RENDERED: OCTOBER 30, 2020; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2019-CA-1704-ME

TIMOTHY DAVID SLONAKER                                    APPELLANT


APPEAL FROM JEFFERSON CIRCUIT COURT
v.        HONORABLE LAUREN ADAMS OGDEN, JUDGE
ACTION NO. 19-D-502656-001


JULIETTA ANN YADON                                         APPELLEE



AND                     NO. 2019-CA-1707-ME



TIMOTHY DAVID SLONAKER                                    APPELLANT


APPEAL FROM JEFFERSON CIRCUIT COURT
v.        HONORABLE LAUREN ADAMS OGDEN, JUDGE
ACTION NO. 19-D-502707-001


JULIETTA ANN YADON                                         APPELLEE

OPINION<br>AFFIRMING

** ** ** ** **

BEFORE: COMBS, DIXON, AND TAYLOR, JUDGES.

COMBS, JUDGE: In these consolidated appeals, the Appellant, Timothy David Slonaker, appeals from an order of protection restraining him from any contact with his former wife, Julietta Ann Yadon, the Appellee. Timothy also appeals from an order dismissing his petition for a protective order against Julietta. After our review, we affirm.

The parties worked at the Ford Plant in Louisville at the time of their marriage in 2017. Their divorce was finalized in June 2019, and they have continued to work at the same Ford Plant. Timothy is an electrician, and Julietta's position involves driving a cart or a "turtle" to deliver parts. On August 29, 2019, Julietta filed a petition for an order of protection against Timothy, case No. 19-D-502656-001, alleging that:

> On 8/29/2019 and today, [Timothy] talked to a coworker of mine, that didn't even know him. He started slandering me. He told her that he could have any woman he wants. Yesterday, knowing where I park my car he watches. I have witnesses who have seen him do this on numerous occasions. Approximately two weeks ago he was called to the front of the facility, and told to stay away from me by administration, after I made a complaint about his stalking. This was the second time I have had to complain about him to Labor Relations and the second time he has been told to stay away from me.

-2-

He is no longer coming up to me as he had been doing
before on the parking lot and stands back inside the
facility watching when he should be in his designated
area. He was told by administration to have absolutely
no type of contact with me and he has ignored it all. I am
not trying to make him loose [sic] his job, but I fear for
my safety. I want this to stop. I do not know his mental
state and fear he could possibly do me harm.

Julietta further alleged that three weeks earlier, she had seen Timothy talking to a man against whom she had taken out an EPO in 2013, an occurrence that made her extremely nervous; that Timothy's behavior "is really odd"; and that several co-workers had voiced concerns for her safety. Julietta explained that she had called the police in the same time frame because Timothy had come to her house at least six times; that he texted her, stating that he knew she had a boyfriend; and that two days earlier, Timothy had come to her home twice within a twenty-minute period. Julietta requested that Timothy stay away from her, especially at work, and that he stay away from her home and property. She also asked that he stop harassing, slandering, and stalking her.

On August 29, 2019, the court entered an emergency order of protection (EPO) restraining Timothy: from committing further acts of abuse or threats of abuse, stalking, or sexual assault; from any contact with Julietta and directing that he remain 500 feet away from her home and workplace; and from disposing of or damaging any property of the parties. On August 30, 2019,

-3-

Timothy was served with the EPO and a summons to appear for a hearing on September 10, 2019.

On September 3, 2019, Timothy filed his own petition for an EPO against Julietta, case No. 19-D-502707-001, alleging as follows:

> I Timothy (pet) and Julietta (resp) were former spouses. The most physical thing happened at work on the 20th. We both work at ford [*sic*] I was called over to fix a machine and she zoomed past on a buggy almost hitting me making me fall back behind my buggy. She did not beep or let me know she was coming and she knows I have no peripheral vision in my right eye, so I could not see her coming. I had to write a statement to my boss making them aware of the situation. She then shows up in the parking lot on the 30th parking 2 spaces from me when she just had me served with an order and there were 100s of other parking spaces. I have had people following me and taking pictures. She has told me that there are a lot of people who want to beat me up. She is out there slandering my name and causing me problems. I just want her to stay away from me and have no contact with me at all.

On September 3, 2019, Julietta was served with summons to appear at the hearing.

On September 10, 2019, the trial court conducted a hearing on the petitions. We have reviewed the recorded proceedings. Both parties were present and represented by counsel. The court read the allegations of both petitions into the record. Julietta testified. Timothy called three witnesses: Pat Brown, his boss; David Stephens, his co-worker; and Robert Applegate, his union representative.

-4-

After they testified, the hearing was continued to October 15, 2019, due to time constraints.

The trial court made detailed handwritten factual findings summarizing the testimony presented. In case No. 19-D-502656-001, *Julietta Ann Yadon v. Timothy David Slonaker,* the September 10, 2019, docket sheet reflects as follows:

> Parties both present w/their counsel, [Julietta] adopted her petition & suppl. w/further testimony. [Julietta] testified as to prior stalking, jealous, manipulative, & narcissistic behaviors of [Timothy] that resulted in the breakup of their marriage. Lots of email, texting, P/C's, showing up @ her house & work area. [Julietta] had to block his # & email address. [Julietta] described [Timothy's] behavior as "odd" & like he was still in love w/her. [Timothy] stopped her in May & in later months, hugging her kissing her & begging her to come back & propositioned her sexually & with drugs. He smacked her on the butt & said he wanted to f[***] her. She called the police "b/c he was scaring her," @ a later late. [Julietta] now carries a gun, which she didn't before. [Timothy] is undergoing therapy for his mental health issues. The parties have a 6-12-19 agreement to "no contact" in place.[1]

In addition, the trial court found that:[2]

---

[1] The parties' June 12, 2019, mediated settlement agreement in their divorce action was made an exhibit to Julietta's testimony at the hearing. Paragraph 19 provided that the parties agreed to have "no direct physical or verbal contact with each other's person or property . . . whether at work or at all locations outside of work." This included "non-verbal communication, text messages, electronic mail, social media and any contact through third parties."

[2] These additional findings are hand-written at the top of the docket sheet order -- apparently due to lack of space at the bottom of the form; they are a continuation of the trial court's summary of Julietta's testimony on September 10, 2019.

[Timothy] has repeatedly asked [Julietta] to get rid of their N/C Order. [Julietta] does fear for her safety. She rarely responds to his communications & does not approach him. She has tried to be pleasant only due to her fear of [Timothy] & never initiated the contact. She reported he put his hands around her throat when they dated to see if she trusted him. She has tried to address the issues @ work prior to filing for an EPO.

The trial court also made findings regarding the testimony of Timothy's witnesses. Pat Brown, his supervisor, testified that he tells Timothy where to be stationed at work and that due to the domestic conflict, Timothy is now kept away from Julietta's work area. David Stephens, Timothy's co-worker, saw Julietta's car parked a few spaces down from Timothy's -- even though Timothy had arrived first. Robert Applegate, Timothy's union representative, confirmed that "each party has made complaints ags't the other that have been unfounded after investig'n. The co. is trying to make accommodations to keep the parties apart @ work."

The trial court made the following findings on its September 10, 2019, docket sheet in case No. 19-D-502707-001, *Timothy Slonaker v. Julietta Ann Yadon*:

[Julietta] claims [Timothy] tried to set her up by stretching/standing & parking in the lane she drives in @ work with her turtle/buggy & said, "Baby girl, you know you almost hit me." She doesn't approach him or even contact him. [Julietta] detailed lots of instability,

-6-

harassm't, stalking behaviors since the parties' sep'n,
although she thought they could try to be friendly. . . .

The trial court incorporated the findings that it made in each case into the other, respectively.

On October 15, 2019, Timothy testified, and Julietta testified on rebuttal. At the close of the hearing, the trial court announced that it was dismissing Timothy's petition, having concluded that he had not met his burden of proof. With respect to Julietta's petition, the court found that stalking has occurred and that a protective order would be issued because of "her subjective state of mind as well as the frequent unwanted contacts, kissing, hugging, propositioning, intimidation."

On October 15, 2019, the trial court entered a domestic violence order (DVO) in case No. 19-D-502656-001, *Julietta Ann Yadon v. Timothy David Slonaker*. The court found that "it was established by a preponderance of the evidence, that an act(s) of . . . ☑ stalking . . . has occurred and may again occur[.]" The trial court ordered that Timothy "be restrained from committing further acts of abuse or threats of abuse, stalking or sexual assault . . . and . . . from any unauthorized contact" with Julietta, effective for three years until October 14, 2022. The DVO requires that Timothy remain at least 500 feet away from Julietta and from her home address and that he be restrained from disposing of or damaging any property of the parties.

Attached to the DVO is the trial court's October 15, 2019, docket sheet, which reflects that "stalking has occurred & likely to occur again. 3 yr. DVO, as [Julietta] has been in bodily fear (her subjective state of mind)." The docket sheet also contains the following findings:

> Parties present with counsel. Neither party has abided by the no contact order in the parties' divorce action. [Timothy] testified that when [Julietta] came into his work area or is in maintenance, he goes the other way. He claims [Julietta] has sent him 40+ texts & is still pursuing him. Police were called out to work since the last Ct date. [Timothy] alleges he only goes where he is directed to go @ work. He acknowledges he went to her house 2x uninvited. [Timothy] believes [Julietta] is motivated to get [Timothy] in trouble. [Julietta] testified he does still park by her car, which caused her to be extremely shaky & unable to do her job. On 10/3/19, she saw his car driving into her subdivision & showed up in her work area & in the parking lot on her breaks since last Ct date. [Timothy] admonished by Ct for repeated improper behaviors/contacts.

Timothy filed a notice of appeal to this Court, appeal No. 2019-CA-1704-ME.

On October 15, 2019, the trial court entered an order in case No. 19-D-502707-001, *Timothy Slonaker v. Julietta Ann Yadon,* dismissing Timothy's petition. Attached to the order dismissing is the trial court's October 15, 2019, docket sheet with its findings, reciting as follows:

> Parties both present w/counsel. [Timothy] testified it is [Julietta] who texts him repeatedly. He claims he avoids her when he can & it is she who pursues him. He claims

-8-

she never asked him to stop contacting her. He claims she hangs around his work area & has even tried to take his picture. He claims it is [Julietta] who parks near him. **[Julietta] is very credible in her testimony & fear of [Timothy]. [Timothy] is not credible in his allegations & has shown infrequent disregard for the EPO in place. [Julietta] was credible that she only responded to texts from [Timothy], & did not initiate contact w/[Timothy].** Petition dismissed.

(Emphasis added). Timothy filed a notice of appeal to this Court, appeal No. 2019-CA-1707-ME.

By order of this Court entered on April 20, 2020, the appeals were consolidated for all purposes. By order entered June 22, 2020, this Court granted the motion of Julietta's counsel to withdraw and allowed her 15 days to notify this Court if she intended to obtain new counsel.[3] Julietta has not obtained counsel nor has she filed a brief. Although CR[4] 76.12(8)(c) allows us to impose penalties when an appellee has not filed a brief, the decision to do so lies within our sound discretion. *Roberts v. Bucci*, 218 S.W.3d 395 (Ky. App. 2007). In this case, we have elected to consider the appeals on their merits.

Timothy filed separate briefs prior to the entry of the order consolidating. In appeal No. 2019-CA-1704-ME, he argues that the events as

---

[3] On June 16, 2020, this Court received a document submitted by Julietta and captioned, "Pro Se Entry of Appearance Opposing this Appeal."

[4] Kentucky Rules of Civil Procedure.

recounted and the evidence of record do not support a conclusion that stalking occurred.

After a hearing, a court may issue a DVO if it "finds by a preponderance of the evidence that domestic violence and abuse has occurred and may again occur . . . ." KRS[5] 403.740(1).

KRS 403.720 provides in relevant part that:

(1) "Domestic violence and abuse" means physical injury, serious physical injury, stalking, sexual abuse, strangulation, assault, or the infliction of fear of imminent physical injury, serious physical injury, sexual abuse, strangulation, or assault between family members or members of an unmarried couple;

(2) "Family member" means a spouse, including a former spouse . . . .

As Timothy notes, stalking was not enumerated in KRS 403.720(1) until the statute was amended effective January 1, 2016. KRS Chapter 403 does not define stalking. Timothy draws our attention to an unpublished decision of this Court, *Kiser v. Kiser*, No. 2018-CA-0812-ME, 2019 WL 169204 (Ky. App. Jan. 11, 2019), which explains that:

While the statutes relating to domestic violence and abuse do not define "stalking," it is appropriate for us [to] borrow the definition of "stalking" contained and applied in the similar IPO [interpersonal protective order] statutes. *See Halloway v. Simmons*, 532 S.W.3d 158, 162

---

[5] Kentucky Revised Statutes.

-10-

(Ky. App. 2017); *Calhoun v. Wood*, 516 S.W.3d 357, 360-61 (Ky. App. 2017).

KRS 456.010(7) prohibits conduct which constitutes first and second-degree stalking under KRS 508.140 and KRS 508.150.

> (1) A person is guilty of stalking in the second degree when he intentionally:
>
> (a) Stalks another person; and
>
> (b) Makes an explicit or implicit threat with the intent to place that person in reasonable fear of:
>
>> 1. Sexual contact as defined in KRS 510.010;
>>
>> 2. Physical injury; or
>>
>> 3. Death.

KRS 508.150.

> (1)(a) To "stalk" means to engage in an intentional course of conduct:
>       1. Directed at a specific person or persons;
>
>> 2. Which seriously alarms, annoys, intimidates, or harasses the person or persons; and
>>
>> 3. Which serves no legitimate purpose.
>
> . . .

-11-

(2) "Course of conduct" means a pattern of conduct composed of two (2) or more acts, evidencing a continuity of purpose . . . .

KRS 508.130.

To summarize, for an individual to be granted [a DVO] for stalking, he or she must at a minimum prove by a preponderance of the evidence that, an individual intentionally engaged in two or more acts directed at the victim that seriously alarmed, annoyed, intimidated, or harassed the victim, that served no legitimate purpose, and would have caused a reasonable person to suffer substantial mental distress, and that these acts may occur again. Additionally, the individual must prove that there was an implicit or explicit threat by the perpetrator that put the victim in reasonable fear of sexual contact, physical injury, or death.

*Kiser*, 2019 WL 169204, at *4-5 (citing *Halloway*, 532 S.W.3d at 162 (citations omitted) (giving grounds for IPO for stalking)).

Timothy asserts that there was no such course of conduct or threat of violence or harm on his part. We disagree. Julietta's testimony at the September 10, 2019, hearing amply supports the trial court's finding she had established by a preponderance of the evidence that stalking had occurred and that it was likely to occur again.

Julietta explained that after she filed for divorce, Timothy sent her so many texts that she became overwhelmed enough to block him. After she blocked

-12-

him, he started sending emails, which she also blocked. His conduct made her feel stressed, concerned, and scared. Julietta testified that Timothy's whole behavior was just "odd." Timothy would stalk her at her house. On one occasion in May of 2019, Julietta was walking her dog. Timothy got out of his car, started hugging her, said he still loves her, and wanted to have sex with her "on Ecstasy." Julietta testified she has never used Ecstasy, that she had no desire to do so, and that she did not want to have sex with him.

Julietta testified that she had to go to Labor Relations at work after it was reported that Timothy was harassing her while she was working. It was her understanding that Timothy was ordered to stay away. However, he did not. After she met with Labor Relations, Julietta testified about a particular incident when Timothy approached her at work and had physical contact with her; *i.e.*, that he smacked her on her "butt" and said that he wanted to "f…" her. In August 2019, she went to Labor Relations again and had to give a statement because Timothy had been stalking her in the parking lot. Julietta testified that Timothy showed up at McAllister's Cafeteria when she went to meet her son one day and that he has shown up when she has gone to the grocery, always professing his love.

She testified that on August 4, 2019, she called the police because Timothy had shown up at her house six or seven times within an hour and his behavior was scaring her. On August 5, he showed up at her house again -- twice

within 15 minutes. When asked if she had taken any actions to protect herself, Julietta explained that she contacted Labor Relations at work, called the police, and took out the EPO. She now has a gun (which she did not have before) because she is afraid of what Timothy might do, noting that he is seeing a therapist. Julietta further testified that there have been occasions when Timothy would be out in the parking lot waiting for her when she went out to her vehicle on her break. She testified that he has left her a couple of love notes on her windshield.

Timothy's disregard for the EPO supports the trial court's finding that stalking may again occur. On October 15, 2019, Julietta testified that since their last court date, she had seen Timothy's car driving into her subdivision and that he had shown up both in her work area and in the parking lot.

In light of the testimony and evidence, the trial court concluded that Julietta was in bodily fear; *i.e.*, she was put in reasonable fear of physical injury by Timothy's intimidating conduct -- which was an implicit threat. *See Marcum v. Meng*, No. 2020-CA-0134-ME, 2020 WL 5494615, at *3 (Ky. App. Sept. 11, 2020) (Argument that appellant never made any verbal threats of harm "unavailing." Appellant's actions could be taken as an implicit threat.).

In appeal No. 2019-CA-1707-ME, Timothy contends that the trial court erred in refusing to issue a protective order on his behalf. We disagree. Timothy simply re-argues his case. As it was its prerogative to evaluate witness

-14-

credibility, the trial court specifically found that Timothy "is not credible in his allegations."  As this Court explained in *Bailey v. Bailey*, 231 S.W.3d 793, 796 (Ky. App. 2007):

> A family court operating as finder of fact has extremely broad discretion with respect to testimony presented, and may choose to believe or disbelieve any part of it.  A family court is entitled to make its own decisions regarding the demeanor and truthfulness of witnesses, and a reviewing court is not permitted to substitute its judgment for that of the family court, unless its findings are clearly erroneous.

We are persuaded that the trial court did not err in denying Timothy relief.  Consequently, we AFFIRM the orders of the trial court granting a DVO to Julietta and dismissing Timothy's petition for a protective order.


ALL CONCUR.


BRIEF FOR APPELLANT:                NO BRIEF FOR APPELLEE

F. Todd Lewis
Louisville, Kentucky